**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
Courtney E. Maccarone
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
ek@zlk.com
cmaccarone@zlk.com

Rosemary M. Rivas*
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel: (415) 373-1671
rrivas@zlk.com

*Pro Hac Vice Application Forthcoming

Attorneys for Plaintiff and Proposed Classes

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENN FRENCH, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>QUEST DIAGNOSTICS INCORPORATED and OPTUM360, LLC<br>                              Defendants. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Glenn French ("Plaintiff") individually and on behalf of those similarly situated, brings this class action lawsuit against Quest Diagnostics Incorporated ("Quest") and Optum360, LLC ("Optum360") (collectively, "Defendants") based upon personal knowledge as to himself, the investigation of his counsel, and on information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiff, individually and on behalf of all others similarly situated, brings this class action on behalf of all persons whose personal information was compromised as a direct result of Defendants' failure to safeguard millions of patients' highly sensitive medical, personal, and financial information.

2.    Quest is one of the largest medical testing providers in the country and annually serves one in three adult Americans, and half the physicians and hospitals in the United States. In providing its services, Quest collects its customers' medical, personal, and financial information.  Plaintiff, like millions of other consumers, entrusted his sensitive medical, personal, and financial information to Quest when he retained Quest for diagnostic services.

3.    Quest contracts with Optum360 for revenue services operations.  In turn, Optum360 uses American Medical Collection Agency, Inc. ("AMCA") as one of its billing collection agencies. Optum360 and AMCA obtain and share Quest customers' private information.

4.    On June 3, 2019, Quest revealed that an unauthorized user had access to AMCA's system which contained personally identifiably information ("PII") and protected health information ("PHI") (collectively, "PII and PHI") of nearly 12 million of Quest's patients.  The PII and PHI accessed included, but was not limited to, Plaintiff's and Class members' personal information (including Social Security Numbers), financial information (including credit card numbers and bank account information), and personal medical information. Quest further revealed that the exposure occurred between August 1, 2018, and March 30, 2019.

5.    At all relevant times, Quest promised and agreed—throughout its Notice of Privacy Practices and other written assurances—to safeguard and protect PII and PHI in

accordance with Health Insurance Portability and Accountability Act ("HIPAA") regulations, federal, state and local laws, and industry standards. Specifically, Quest tells its patients that it is "committed to protecting the privacy of [their] identifiable health information."[1] Moreover, Quest promises that any "business associates" to which Quest may provide its customers' PII and PHI, are required to maintain the privacy and security of the data.[2] Optum360 similarly states that it "recognize[s] that the privacy of your personal information is important," and promises to "safeguard the information of those we serve."[3]

6.      Contrary to those promises, and despite the fact that the threat of a data breach has been a well-known risk to Defendants, especially due to the valuable and sensitive nature of the data Defendants maintain, Defendants failed to take the reasonable steps to adequately protect the PII and PHI of millions of its patients. The data breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect PII and PHI.

7.      Plaintiff and the Class members would not have provided their PII and PHI to Defendants if Plaintiff and Class members knew that Defendants would breach its promises by failing to ensure that its vendors used adequate security measures.

8.      As a result of Defendants' failure to take reasonable steps to adequately protect the ultra-sensitive PII and PHI of its millions of patients, Plaintiff's and Class members' PII and PHI is now in the hands of thieves.

---

[1] *See Notice of Privacy Practices*, Quest Diagnostics, *available at* https://www.questdiagnostics.com/home/privacy-policy/notice-privacy-practices.html (last accessed June 11, 2019).
[2] *Id.*
[3] *See Privacy Policy*, Optum, *available at* https://www.optum.com/privacy-policy.html (last accessed June 11, 2019).

9.      Defendants' failure to implement and follow basic security procedures has resulted in ongoing harm to Plaintiff and Class members who will continue to experience data insecurity for the indefinite future and remain at serious risk of identity theft and fraud that could result in significant monetary loss.

10.      Accordingly, Plaintiff seeks to recover damages and other relief resulting from the data breach, including but not limited to, compensatory damages, reimbursement of costs that he and others similarly situated will be forced to bear, and declaratory and injunctive relief to mitigate future harms that are certain to occur in light of the scope of this breach.

## JURISDICTION AND VENUE

11.      The Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from one of the Defendants, the amount in controversy exceeds $5,000,000 exclusive of interest and costs, the Class contains more than 100 members, and none of the exceptions under the subsection applies to this action.

12.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a),

13.      This Court has personal jurisdiction over Defendants because they are registered to and regularly do conduct business in this District, and a substantial part of the conduct alleged in this Complaint occurred in, was directed to, and/or emanated, in part, from this District.

14.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the conduct alleged in this Complaint occurred in, were directed to, and/or emanated from this District. Venue is additionally proper because Defendants

4

are registered to and do conduct business in this District, and because Defendant Quest's

principal place of business is located in this District.

## THE PARTIES

15.    Plaintiff Glenn French is a citizen and resident of the State of Florida.

16.    Plaintiff French went to a Quest laboratory to obtain medically prescribed

laboratory testing in or around November 2017.  Plaintiff French provided Quest with personal

information, including PII and PHI, as well as debit card information, as part of obtaining

laboratory testing services from Quest.  A bill for services allegedly performed by Quest, and

allegedly in Plaintiff French's name, was sent to AMCA for collection.  In June 2019, Plaintiff

French received a notification letter from AMCA regarding the data breach. Upon information

and belief, Plaintiff French's PII and PHI, including financial information, was compromised in

the data breach.  Plaintiff French would not have gone to Quest and used Quest's services had

Quest disclosed that it lacked adequate computer systems and data security practices, including

the monitoring of vendors, to safeguard his PII and PHI from theft.

17.    Defendant Quest Diagnostics Incorporated is a Delaware corporation with its

principal place of business in Secaucus, New Jersey.

18.    Defendant Optum360, LLC. is a Delaware limited liability company with its

principal place of business in Eden Prairie, Minnesota.

## FACTUAL ALLEGATIONS

**A.    Quest Diagnostics' Services**

19.    Quest touts itself as "the world's leading provider of diagnostic information services"[4] and has more than 2,200 patient service centers around the country.[5]  Quest annually serves one in three adult Americans, and half the physicians and hospitals in the United States.[6]  Quest provides medical diagnostic testing services in order to "identify and treat disease, inspire healthy behaviors and improve health care management."[7]  Quest's testing services include: blood tests, body fluid testing, tissue pathology and cytology, health screening and monitoring tests, drug screening and testing as well as genetic testing.[8]

20.    Quest asks its customers to bring to their appointment photo identification, current health insurance information, and a method of payment.[9]

21.    Quest charges for the laboratory services it provides to its patients. The invoices Quest sends are laboratory testing fees which are "separate from any bill [patients] may have

---

[4] *See Fact Sheet*, Quest Diagnostics, *available at*
http://newsroom.questdiagnostics.com/index.php?s=30664 (last accessed June 11, 2019).
[5] *See Preparing for a lab test: getting started*, Quest Diagnostics, *available at*
https://www.questdiagnostics.com/home/patients/preparing-for-test/get-started (last accessed June 11, 2019).
[6] *See Fact Sheet*, Quest Diagnostics, *available at*
http://newsroom.questdiagnostics.com/index.php?s=30664 (last accessed June 11, 2019).
[7] *Id.*
[8] See Frequently Asked Questions – Laboratory Testing, Quest Diagnostics, *available at*
https://www.questdiagnostics.com/home/patients/about-testing/faqs.html#requesting1 (last accessed June 11, 2019).
[9] *See Preparing for a lab test: getting started, Quest Diagnostics*, *available at*
https://www.questdiagnostics.com/home/patients/preparing-for-test/get-started (last accessed June 11, 2019).

received from [their] physician."[10]  If a patient's insurance does not cover the services or if a patient is uninsured, then the patient is responsible for payment of the invoice.

22.    If a customer does not pay their invoice within the requested period, their bill will be sent to a collection agency.  Quest contracts with Optum360 for revenue services operations and in turn, Optum360 uses AMCA as one of its billing collection agencies to facilitate the bill collection process.

23.    Upon information and belief, Quest, through Optum360, provided AMCA with Quest patients' PII and PHI.

**B.    Defendants Promised to Protect its Customers' Personal Information**

24.    Quest maintains a Notice of Privacy Practices on its website ("Privacy Practices") and states that it is required by law to maintain the privacy of its customers' protected health information.  Specifically, Quest states that:

> Quest Diagnostics and its wholly owned subsidiaries (collectively "Quest Diagnostics") are committed to protecting the privacy of your identifiable health information. This information is known as "protected health information" or "PHI." PHI includes laboratory test orders and test results as well as invoices for the healthcare services we provide.
>
> **Our Responsibilities**
>
> Quest Diagnostics is required by law to maintain the privacy of your PHI. We are also required to provide you with this Notice of our legal duties and privacy practices upon request. It describes our legal duties, privacy practices and your patient rights as determined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). We are required to follow the terms of this Notice currently in effect. We are required to notify affected individuals in the event of a breach involving unsecured protected health information. PHI is stored electronically and is subject to electronic disclosure. This Notice does not apply to non-diagnostic

---

[10] *See Frequently Asked Questions: Billing Services*, Quest Diagnostics, *available at* https://billing.questdiagnostics.com/PatientBilling/PATFaqExternal.action?getLabCode=f alse&f (last accessed June 11, 2019).

services that we perform such as certain drugs of abuse testing services and clinical trials testing services.[11]

25.    Quest also assures its customers that it will only use its customers' personal information for certain limited purposes, such as "for treatment, payment, or healthcare operations purposes and for other purposes permitted or required by law."[12]

26.    Moreover, Quest states:

> We need your written authorization to use or disclose your health information for any purpose not covered by one of the categories below. Subject to compliance with limited exceptions, we will not use or disclose psychotherapy notes, use or disclose your PHI for marketing purposes or sell your PHI, unless you have signed an authorization. You may revoke any authorization you sign at any time. If you revoke your authorization, we will no longer use or disclose your health information for the reasons stated in your authorization except to the extent we have already taken action based on your authorization.[13]

27.    In its Privacy Policy, Optum360 similarly states it "recognize[s] that the privacy of your personal information is important" promising to "safeguard the information of those we serve."[14]

28.    Accordingly, Defendants were aware of their obligations and duties to protect its patients' PII and PHI, as evidenced by the statements made on their websites.

## C.    The Data Breach

29.    On June 3, 2019, in a filing with the Securities and Exchange Committee ("SEC"), Quest disclosed that on May 14, 2019, AMAC had notified Quest and Optum360 of the

---

[11] *See Notice of Privacy Practices*, Quest Diagnostics, *available at* https://www.questdiagnostics.com/home/privacy-policy/notice-privacy-practices.html (last accessed June 11, 2019).
[12] *Id.*
[13] *Id.*
[14] *See Privacy Policy*, Optum, https://www.optum.com/privacy-policy.html (last accessed June 11, 2019).

existence of a massive data breach affecting AMCA's web payment page comprising the

personal information of 11.9 million Quest patients.  Specifically, in the Form 8-K, Quest stated

that:

- between August 1, 2018 and March 30, 2019 an unauthorized user had access to AMCA's system that contained information that AMCA had received from various entities, including Quest Diagnostics, and information that AMCA collected itself;

- the information on AMCA's affected system included financial information (e.g., credit card numbers and bank account information), medical information and other personal information (e.g., Social Security Numbers);

- as of May 31, 2019, AMCA believes that the number of Quest Diagnostics patients whose information was contained on AMCA's affected system was approximately 11.9 million people; and

- AMCA has been in contact with law enforcement regarding the incident.[15]

30.    In a press release published on Quest's website on June 3, 2019, Quest stated:

American Medical Collection Agency (AMCA), a billing collections service provider, has informed Quest Diagnostics that an unauthorized user had access to AMCA's system containing personal information AMCA received from various entities, including from Quest. AMCA provides billing collections services to Optum360, which in turn is a Quest contractor. Quest and Optum360 are working with forensic experts to investigate the matter.

AMCA first notified Quest and Optum360 on May 14, 2019 of potential unauthorized activity on AMCA's web payment page. On May 31, 2019, AMCA notified Quest and Optum360 that the data on AMCA's affected system included information regarding approximately 11.9 million Quest patients. AMCA believes this information includes personal information, including certain financial data, Social Security numbers, and medical information, but not laboratory test results.

AMCA has not yet provided Quest or Optum360 detailed or complete information about the AMCA data security incident, including which

---

[15] Quest Form 8-K filed June 3, 2019 *available at* https://www.sec.gov/Archives/edgar/data/1022079/000094787119000415/ss138857_8k.htm (last accessed June 11, 2019)

information of which individuals may have been affected. And Quest has not been able to verify the accuracy of the information received from AMCA.

Quest is taking this matter very seriously and is committed to the privacy and security of our patients' personal information. Since learning of the AMCA data security incident, we have suspended sending collection requests to AMCA.

Quest will be working with Optum360 to ensure that Quest patients are appropriately notified consistent with the law.

We are committed to keeping our patients, health care providers, and all relevant parties informed as we learn more.[16]

31.     Accordingly, for approximately eight months, unauthorized parties maintained uninterrupted access to the AMCA system containing financial information (e.g., credit card numbers and bank account information), medical information, and other personal information, including Social Security Numbers of nearly 12 million of Quest's customers.

32.     Despite being notified on May 14, 2019 of the data breach, Quest and Optum360 waited an additional two weeks before disclosing the breach to the Plaintiff and Class members.

33.     Quest collects and stores an enormous amount of PII and PHI which it provides to its vendors and sub-contractors such as Optum360 and AMCA to further its business. As a recipient of sensitive patient PII and PHI, Optum360 was similarly obligated to safeguard the integrity of such data on behalf of Quest patients. Despite understanding the consequences of inadequate data security, Defendants failed to take appropriate protective measures to protect and secure the PII and PHI of nearly 12 million people.

---

[16] See *News Release: Quest Diagnostics Statement on the AMCA Data Security Incident*, Quest Diagnostics (June 3, 2019), *available at* http://newsroom.questdiagnostics.com/AMCADataSecurityIncident (last accessed June 11, 2019).

**D.**    **The Data Breach was a Foreseeable Risk of which Defendants were on Notice**

34.    Identity thieves and cyber criminals have targeted the medical industry in the last several years given the treasure trove of ultra-sensitive personal data stored on these systems.

35.    The medical industry is rife with examples of hackers targeting users' PII and PHI, including breaches of systems maintained by Anthem, Premera, and St. Joseph Health System, among others, all of which predate the time frame Defendants have identified for the data breach at issue.

36.    As early as 2014, the FBI alerted healthcare stakeholders that they were the target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)".[17]

37.    In fact, in a Form 10-K filed with the SEC on February 21, 2019, Quest acknowledged that it was aware that its systems were subject to cyber-attacks.[18]  Specifically, Quest stated that cyber-attacks could result in "unauthorized persons misappropriating intellectual property and other confidential information, including patient data that we obtain, transmit and store on and through our IT systems."[19]

38.    Further, Quest acknowledged that the same cyber threats that it faces also apply to its vendors.  Specifically, Quest stated:

> Third parties to whom we outsource certain of our services or functions, or with whom we interface, may store our confidential,

---

[17] *See FBI warns healthcare firms they are targeted by hackers,* Reuters (Aug. 20, 2014), *available at* http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U201 40820 (last accessed June 11, 2019).

[18] *See* Quest Form 10-K (Feb. 21, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1022079/000102207919000030/dgx123 1201810-k.htm (last accessed June 26, 2019).

[19] *Id.*

patient data or other confidential information, are also subject to the
risks outlined above. A breach or attack affecting these third parties
could also harm our business, results of operations and reputation.[20]

39.     Quest was previously the target of a cyber-attack that compromised its systems.

In December 2016, "an internet application on [Quest's] IT network had been the target of an

external cyber-attack, resulting in the theft of certain patient data."[21]

40.     Accordingly, Quest and Optum360 knew, given the vast amount of PII and PHI

they managed and maintained, and (Quest) through personal experience, that they were a target

of security threats, and therefore understood the risks posed by insecure data security practices

and systems.  Defendants' failure to heed warnings and to otherwise maintain adequate security

practices resulted in this data breach.

**E.    Defendants, At All Relevant Times, Had A Duty To Plaintiff And Class Members To Properly Secure Their PII and PHI**

41.     Defendants, at all relevant times, had a duty to Plaintiff and Class members to

properly secure their PII and PHI, encrypt and maintain such information using industry standard

methods, utilize available technology to defend their systems from invasion, act reasonably to

prevent foreseeable harms to Plaintiff and Class members, and promptly notify customers when

Defendants became aware of the potential that its customers' PII and PHI may have been

compromised.

42.     Defendants' duty to use reasonable security measures arose as a result of the

special relationship that existed between Defendants, on the one hand, and Plaintiff and the Class

members, on the other hand. The special relationship arose because Plaintiff and the members of

the Class entrusted Defendants with their PII and PHI as part of receiving or paying for

---

[20] *Id.*
[21] *Id.*

laboratory services, which are confidential in nature. Defendants had the resources necessary to prevent the data breach but neglected to adequately invest in security measures, despite their obligation to protect such information. Accordingly, Defendants breached their common law, statutory and other owed duties to Plaintiff and Class members.

43.     Defendants' duty to use reasonable security measures also arose under HIPAA. Under HIPAA, Defendants were required to "reasonably protect" PHI from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Plaintiff's and Class members' sensitive information compromised in the data breach includes PHI, such as provider names, dates of service, medical billing information and potentially other "protected health information" within the meaning of HIPAA.

44.     Defendants' duty to use reasonable security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data by entities like Defendants.

45.     The data breach was a direct and proximate result of Defendants' failure to: (1) properly safeguard and protect Plaintiff's and Class members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (2) establish and implement appropriate safeguards to ensure the security and confidentiality of Plaintiff's and Class members' PII and PHI; and (3) protect against reasonably foreseeable threats to the security or integrity of such information.

**F.**    **Plaintiff and Class Members Were Grievously Harmed By The Data Breach**

46.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

47.    The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use identifying data such as Social Security Numbers to open financial accounts, receive government benefits and incur charges and credit in a person's name.[24] As the GAO Report states, this type of identity theft is the most harmful because it often takes some time for the victim to become aware of the theft, and the theft can impact the victim's credit rating adversely.

48.    Accordingly, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[25]

---

[22] 17 C.F.R. § 248.201 (2013).

[23] *Id.*

[24] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent Is Unknown* (June 2007), United States Government Accountability Office, *available at* https://www.gao.gov/new.items/d07737.pdf (last visited June 11, 2019).

[25] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission, 4 (September 2013), *available at* http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf (last visited June 11, 2019)

49.     PII is such a valuable commodity to identity thieves that once the information has

been compromised, criminals often trade the information on the dark web for years.  According

to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data
> may be held for up to a year or more before being used to commit
> identity theft. Further, once stolen data have been sold or posted on
> the Web, fraudulent use of that information may continue for
> years. As a result, studies that attempt to measure the harm
> resulting from data breaches cannot necessarily rule out all future
> harm.[26]

50.     A study by Experian found that the "average total cost" of medical identity theft is

"about $20,000" per incident, and that a majority of victims of medical identity theft were forced

to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[27]

51.     Indeed, data breaches and identity theft have a crippling effect on individuals and

detrimentally impact the entire economy as a whole.

52.     For all the above reasons, Plaintiff and the Class members have suffered harm; and

there is a substantial risk of injury to Plaintiff and the Class members that is imminent and concrete

and that will continue for years to come.

53.     As a direct and proximate result of Defendants' wrongful actions and inaction,

Plaintiff and Class members have suffered injury and damages, including the increased risk of

identity theft and identity fraud, improper disclosure of PII and PHI, the time and expense

necessary to mitigate, remediate, and sort out the increased risk of identity theft and the inability

to use debit or credit cards because those cards were cancelled, suspended, or otherwise rendered

---

[26] GAO Report at 29.

[27] *See Study: Medical identity theft is costly for victims,* CNET (Mar. 3, 2010), *available at* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed June 11, 2019).

unusable as a result of the data breach, and/or false or fraudulent charges stemming from the data breaches.

## CLASS ACTION ALLEGATIONS

54.    Plaintiff brings this action on behalf of himself and on behalf of two classes – a Nationwide Class and a Florida Subclass (together "Classes" or "Class Members") pursuant to the Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

55.    The Nationwide Class is defined as follows: All persons in the United States whose PII and PHI was compromised as a result of the breach announced by Quest on or around June 3, 2019.

56.    The Florida Subclass is defined as follows: All persons in the State of Florida whose PII and PHI was compromised as a result of the breach announced by Quest on or around June 3, 2019.

57.    Excluded from the proposed Classes are: Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

58.    Plaintiff reserves the right to re-define the Class definitions after conducting discovery.

59.    **Numerosity (Fed. R. Civ. P. 23(a)(1)**.  The Class members are so numerous that joinder of all members is impracticable. Based on information and belief, the Classes include nearly 12 million individuals from across the country who had their PII and PHI compromised

during the data breach. The parties will be able to identify the exact size of the Classes through discovery and Defendants' own documents.

60.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Classes.  Questions common to the Classes include, but not limited to the following:

a.     Whether Defendants had a legal duty to implement and maintain reasonable security procedures and practices for the protection of Class members' PII and PHI, including by vendors;

b.     Whether Defendants breached their legal duty to implement and maintain reasonable security procedures and practices for the protection of Class members' PII and PHI;

c.     Whether Defendants' conduct, practices, actions, and omissions, resulted in or were the proximate cause of the data breach, resulting in the loss of PII and PHI of Plaintiff and Class members;

d.     Whether Defendants had a legal duty to provide timely and accurate notice of the data breach to Plaintiff and Class members;

e.     Whether Defendants breached their duty to provide timely and accurate notice of the data breach to Plaintiff and Class members;

f.     Whether and when Defendants knew or should have known that AMCA's computer systems were vulnerable to attack;

g.     Whether Defendants failed to implement and maintain reasonable and adequate security measures, procedures, and practices to safeguard Class members' PII and PHI, including by vendors;

        h.        Whether Defendants breached express or implied contracts with Plaintiff and the Class in failing to have adequate data security measures despite promising to do so;

        i.        Whether Defendants' practices, actions, and omissions constitute unfair or deceptive business practices;

        j.        Whether Plaintiff and Class members suffered legally cognizable damages as a result of Defendants' conduct, including increased risk of identity theft and loss of value of their PII and PHI; and

        k.        Whether Plaintiff and Class members are entitled to relief, including damages and equitable relief.

61.    **Typicality (Fed. R. Civ. P. 23(a)(3))**.  Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class members.  Plaintiff, like all Class members, had his personal information compromised in the data beach.

62.    **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)**.  Pursuant to Rule 23(a)(4), Plaintiff and his counsel will fairly and adequately protect the interests of the Classes. Plaintiff has no interest antagonistic to, or in conflict with, the interested of the Class members. Plaintiff has retained counsel experienced in prosecuting class actions and data breach cases.

63.    **Superiority (Fed. R. Civ. P. 23(b)(3)**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the

benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

64.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

a.    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendants; or

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

65.    **Issue Certification (Fed. R. Civ. P. 23(c)(4).** In the alternative, the common questions of fact and law, set forth in Paragraph 60, are appropriate for issue certification on behalf of the proposed Classes.

<u>**COUNT I**</u>

**NEGLIGENCE**

(On Behalf of the Nationwide Class Against Defendants)

66.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

67.    Quest required Plaintiff and Class members to submit non-public, sensitive PII and PHI to obtain medical services, which Quest provided to Optum360 for billing purposes.

68.    Defendants had (and continue to have) a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII and PHI.  Defendants also had (and continue to have) a duty to use ordinary care in activities from which harm might be reasonably anticipated (such as in the storage and protection of PII and PHI within their possession, custody and control and that of their vendors).

69.    Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Quest and its patients, which is recognized by laws including but not limited to HIPAA. Only Defendants were in a position to ensure that their systems were sufficient to protect against the harm to Plaintiff and the Class members from a data breach.

70.    Defendants violated these standards and duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII and PHI entrusted to it – including Plaintiff's and Class members' PII and PHI. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII and PHI.

71.     Defendants, by and through their negligent actions, inaction, omissions, and want of ordinary care, unlawfully breached their duties to Plaintiff and Class members by, among other things, failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII and PHI within their possession, custody and control.

72.     Defendants, by and through their negligent actions, inactions, omissions, and want of ordinary care, further breached their duties to Plaintiff and Class members by failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit their processes, controls, policies, procedures, protocols, and software and hardware systems for complying with the applicable laws and safeguarding and protecting their PII and PHI.

73.     But for Defendants' negligent breach of the above-described duties owed to Plaintiff and Class members, their PII and PHI would not have been released, disclosed, and disseminated without their authorization.

74.     Plaintiff's and Class members' PII and PHI was transferred, sold, opened, viewed, mined and otherwise released, disclosed, and disseminated to unauthorized persons without their authorization as the direct and proximate result of Defendants' failure to design, adopt, implement, control, direct, oversee, manage, monitor and audit their processes, controls, policies, procedures and protocols for complying with the applicable laws and safeguarding and protecting Plaintiff's and Class members' PII and PHI.

75.      Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused this data breach constitute negligence.

76.     As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the data breach, Plaintiff and Class members have suffered (and will continue to suffer) ongoing,

imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

## COUNT II

### BREACH OF CONTRACT

(On Behalf of the Nationwide Class Against Quest)

77.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

78.     Plaintiff and Class members, upon information and belief, entered into express contracts with Quest that included Quest's promise to protect nonpublic personal information given to Quest or that Quest gathered on its own, from disclosure.

79.     Plaintiff and Class members performed their obligations under the contracts when they provided their PII and PHI to Quest for laboratory and diagnostic services and when they paid for the service provided by Quest.

80.     Quest breached its contractual obligations to protect the nonpublic personal information Quest possessed and was entrusted with when the information was accessed by unauthorized persons as part of the data breach.

81.     As a direct and proximate result of Quest's above-described breach of contract, Plaintiff and Class members have suffered (and will continue to suffer) ongoing, imminent, and

impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

## COUNT III

## BREACH OF IMPLIED CONTRACT

(On Behalf of the Nationwide Class Against Defendants)

82.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

83.     Defendants provided Plaintiff and Class members with an implied contract to protect and keep private their PII and PHI.

84.     Plaintiff and Class members would not have provided their PII and PHI to Defendants or their subsidiaries or contractors, but for Defendants' implied promises to safeguard and protect their information.

85.     Plaintiff and Class members performed their obligations under the implied contract when they provided their PII and PHI to Quest for laboratory and diagnostic services and when they paid for the service provided by Quest.

86.     Defendants breached the implied contracts with Plaintiff and Class members by failing to protect and keep private their PII and PHI.

87.    As a direct and proximate result of Quest's above-described breach of implied contract, Plaintiff and Class members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

<u>**COUNT IV**</u>

**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat.§ 501.201, *et seq*.**

(On Behalf of the Florida Subclass Against All Defendants)

88.    Plaintiff realleges and incorporates by reference each of the allegations set forth above.

89.    Plaintiff is a "consumer" who used his debit card to make a payment to Quest. *See* Fla. Stat.§ 501.203(7).

90.    FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat.§ 501.204.

91.    Defendants, by failing to inform consumers (including Plaintiff and Florida Subclass members) of their unsecure, non-compliant, and otherwise insufficient data and

information security practices, advertised, sold, serviced, and otherwise induced those consumers to purchase goods and services.

92.    Defendants knew or should have known that the AMCA computer systems and data security practices were inadequate to safeguard Florida Subclass members' PII and PHI entrusted to it, and that risk of a data breach or theft was highly likely.

93.    Defendants should have disclosed this information because Defendants were in a superior position to know the true facts related to the defective data security.

94.    Defendants' failures constitute false and misleading representations, which have the capacity, tendency, and effect of deceiving or misleading consumers (including Plaintiff and Florida Subclass members) regarding the security of AMCA's network and aggregation of PII and PHI.

95.    The representations upon which consumers (including Plaintiff and Florida Subclass members) relied were material representations (*e.g.*, as to Defendants' adequate protection of PII and PHI), and consumers (including Plaintiff and Florida Subclass members) relied on those representations to their detriment.

96.    Defendants employed these false representations to promote the sale of a consumer good or service, which Plaintiff and Florida Subclass members purchased.

97.    Defendants' conduct is unconscionable, deceptive, and unfair, as it is likely to, and did, mislead consumers acting reasonably under the circumstances. As a direct and proximate result of Defendants' conduct, Plaintiff and other Class members have been harmed, in that they were not timely notified of the data breach, which resulted in profound vulnerability to their personal information and other financial accounts.

98.     As a direct and proximate result of Defendants' unconscionable, unfair, and deceptive acts and omissions, Plaintiff's and Florida Subclass members' PII and PHI was disclosed to third parties without authorization, causing and will continue to cause Plaintiff and Florida Subclass members damages.

## COUNT V

### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT,

### N.J.S.A. 56:8-1, *et seq.*

(On Behalf of the Nationwide Class Against Quest)

99.     Plaintiff realleges and incorporates by reference each of the allegations set forth above.

100.     The New Jersey Consumer Fraud Act ("NJCFA") prohibits the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J.S.A. 56:8-2.  The NJCFA applies whether any person has in fact been misled, deceived or damaged thereby.

101.     At all relevant times material hereto, Quest conducted trade or commerce, or furnished services in the State of New Jersey.

102.     Plaintiff, Quest, and the proposed Class members as "persons" within the meaning of N.J.S.A. 56:8-1(d).

103.    Quest's medical treatments are "merchandise" within the meaning of N.J.S.A. 56:8-1(c) because they are "objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."

104.    Quest, while conducting trade or commerce or furnishing services in the State of New Jersey, engaged in deceptive acts and practices in violation of N.J.S.A. 56:8-2, because:

a.    Defendant failed to enact adequate privacy and security measures to protect the Class members' PII and PHI from unauthorized disclosure, release, data breach or theft;

b.    Defendant failed to take proper action to address known security risks;

c.    Defendant made false or misleading representations that it would maintain adequate data privacy and security practices and procedures to safeguard the PII and PHI from unauthorized disclosure, release, data breach or theft;

d.    Defendant failed to disclose, omitted, actively concealed the material fact of the inadequacy of its data security or the true characteristics and quality of their data security;

e.    Defendant represented on its website that it is "committed to protecting the privacy of your identifiable health information," when, in fact, Quest failed to safeguard customers' information by providing it to AMCA who had deficient data security protection; and

f.    Defendant made false or misleading representations that that it would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of PII and PHI including but not limited to duties imposed by HIPAA.

105.     The above listed acts were deceptive because they were likely to mislead a

reasonable consumer acting reasonably under the circumstances, and such acts were immoral,

unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiff and

Class members.

106.     As set out above, because only Defendant knew (or should have known) that it

was not complying with its own data security representations and obligations, there was no way

for members of the public, including Plaintiff and Class members, to avoid the injury caused by

Defendant's conduct.  Defendant's failure to use adequate data security practice and failure live

up to its data security representations and obligations did not create any countervailing benefits.

107.     Plaintiff and Class members reasonably expected that Defendant would protect

their PII and PHI and provide truthful statements regarding their privacy policies.

108.     Defendant engaged in omission of material facts, deception, active concealment,

and misrepresentation with the intent that Plaintiff and the putative Classes would rely on the

same when providing PII and PHI to Defendant.

109.     Defendant's failure to disclose its actual (and substandard) security practices

substantially injured the public because it caused millions of consumers to enter into transactions

they otherwise would not have, and because it compromised the integrity of Plaintiff's and the

Class members' PII and PHI.  Further, Defendant's use of inadequate security did not create any

benefits sufficient to outweigh the harm it caused.

110.     Defendant's deceptive acts or practices and general course of conduct is injurious

to the public interest, and such acts are ongoing and/or have a substantial likelihood of being

repeated inasmuch as the harmful effects of their misconduct may last for years. Defendant's

violations present a continuing risk to Plaintiff and the proposed Class members, as well as to the general public.

111.    As a direct and proximate result of Quest's conduct, Plaintiff and Class members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

112.    Plaintiff seeks relief under N.J.S.A. 56:8-2, 56:8-19, including but not limited to actual damages in an amount to be proven at trial, treble damages, and reasonable attorney's fees and costs. The amount of such damages is to be determined at trial.

113.    Plaintiff also seeks to enjoin Defendant, pursuant to N.J.S.A. 56:8-19, from its deceptive acts and practices described above. Each Class member will be irreparably harmed unless the Court enjoins Defendant's unlawful, deceptive actions in that Defendant will continue to fail to protect PII and PHI, entrusted to them, as detailed herein.

114.    Plaintiff will mail this complaint to the Attorney General within 10 days of filing, pursuant to N.J.S.A. 56:8-20.

115.    In the event that New Jersey law is not applied, Defendant's actions, as complained of herein, constitute unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the consumer protection statutes of each of the fifty states.

## DEMAND FOR JURY TRIAL

116.   Plaintiff hereby demands a jury trial on all issues so triable.

DATED: July 10, 2019                    **LEVI & KORSINSKY, LLP**

                                        _/s/ Eduard Korsinsky_

                                        Eduard Korsinsky
                                        Courtney E. Maccarone
                                        55 Broadway, 10th Floor
                                        New York, NY 10006
                                        Tel: (212) 363-7500
                                        ek@zlk.com
                                        cmaccarone@zlk.com

                                        **LEVI & KORSINSKY LLP**
                                        Rosemary M. Rivas*
                                        rrivas@zlk.com
                                        44 Montgomery Street, Suite 650
                                        San Francisco, CA 94104
                                        Tel: (415) 373-1671
                                        rrivas@zlk.com

                                        **CASEY GERRY SCHENK FRANCAVILLA
                                        BLATT & PENFIELD, LLP**
                                        Gayle M. Blatt*
                                        gmb@cglaw.com
                                        110 Laurel Street
                                        San Diego, CA 92101
                                        Tel.: (619) 238-1811
                                        Fax: (619) 544-9232


                                        *Pro Hac Vice Application Forthcoming

                                        _Attorneys for Plaintiff and Proposed Classes_